UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

VALVETECH, INC.,

                                        Plaintiff,

                                                                    Case # 17-CV-6788-FPG

v.

                                                                    DECISION AND ORDER

AEROJET ROCKETDYNE, INC.,

                                        Defendant.

## INTRODUCTION

A jury trial in this matter is scheduled to begin on June 12, 2023.  The parties have filed over a dozen motions *in limine*.  The Court resolves the motions below.  The parties must bear in mind, however, that they "have no inherent right to an *in limine* ruling and such rulings are viewed as a preliminary opinion given to allow the parties to formulate their trial strategy and allow the Court to manage the trial in the most efficient way possible."  *Horn v. Med. Marijuana, Inc.*, No. 15-CV-701, 2021 WL 1700257, at *1 (W.D.N.Y. Apr. 29, 2021).  "The trial court is not bound by an *in limine* ruling and can change its determination during the trial where sufficient facts have developed to warrant the change or even if nothing unexpected happens at trial."  *Id.*

## DISCUSSION

### I.   Aerojet's Motion *in Limine* No. 1 – Michael Timko

Aerojet moves to exclude portions of the expert testimony of Michael Timko, ValveTech's technical expert.  ECF Nos. 217, 235; *see also* ECF No. 248-4 (copy of Timko's expert report) [hereinafter "Timko Rep."].  The Court addresses each objection below.

a. **Opinions on Damages**

Aerojet moves to exclude Timko's opinions that (1) Aerojet avoided months of development delays through its access to, and use of, ValveTech's trade secrets, ECF No. 235 at 14-17; and (2) Boeing's CST-100 Starliner would have been used "4.5 missions" per year for sixty years. Timko Rep. ¶ 397.  ValveTech's damages expert, Justin R. Blok, relied in part on these opinions to calculate ValveTech's damages.  *See, e.g.*, ECF No. 192-39 ¶¶ 67, 69, 81, 91 (copy of Blok's report) [hereinafter "Blok Rep."].

First, Aerojet asserts that it is "speculative and conjectural" for Timko to believe that "an avoided delay that would have lasted mere <u>months</u> would justify a damages window lasting <u>60 years</u>."  ECF No. 235 at 12.  Aerojet's argument is not persuasive.  The avoided delays and expected life of the Starliner program are distinct issues that relate to different categories of damages: unjust enrichment and lost profits, respectively.  *See* Blok Rep. at 30-37, 38-46.  One does not "justify" the other; nor do they, as Aerojet claims, conflict with each other.  ECF No. 235 at 12.

Second, Aerojet contends that "[e]xclusion is also warranted for failure to identify a reliable (or indeed any) <u>methodology</u> by which Mr. Timko reached" his opinion that the Starliner would operate for sixty years at a rate of 4.5 missions per year.  *Id.* at 13; *see also* Timko Rep. ¶ 397.  The Court disagrees.  As an initial matter, Aerojet does not dispute that Timko has expertise "by knowledge, skill, experience, training, or education."  Fed. R. Ev. 702; *see also* Timko Rep. ¶¶ 23-37.  In this case, to estimate the design life of the Starliner, Timko "compar[ed] the unknown to an analogous known experience."  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013).  Based on his education and experience, Timko believes the Russian "Soyuz manned spacecraft" is an adequate comparator with respect to the Starliner's estimated

design life, as the Soyuz and the Starliner "are both manned spacecraft launched on a rocket booster and both are robust designs aimed at reliable, frequent use."  Timko Rep. ¶ 397.  Timko opines that the Space Shuttle is an adequate comparator with respect to the Starliner's expected frequency of use given the similarities between the Shuttle's "operating history" and the expected operations of the Starliner.  *See id.* ¶¶ 58-60, 69-70, 397.

Thus, contrary to Aerojet's argument, Timko did identify a methodology by which he reached his "60-year" opinion.  Furthermore, the Court declines to address Aerojet's claim that these comparators involved "cherry-picking" evidence, since, aside from baldly asserting as much, Aerojet fails to meaningfully challenge the substantive reasons that Timko identified for selecting the Soyuz and Shuttle as comparators.[1]  ECF No. 235 at 13; *see also United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").  Aerojet has developed no persuasive reason to depart from the principle that the adequacy of Timko's comparators goes to "the weight of the testimony and its credibility, not its admissibility." *Alaska*, 738 F.3d at 970.

Third, Aerojet criticizes Timko's opinion regarding avoided production delays on the basis that he has no discernible methodology to estimate each delay that was avoided by using ValveTech's proprietary information.  *See* ECF No. 235 at 14-17.

Timko was asked about his methodology at his deposition:

Q: What methodology did you use to calculate the delays that you provided in your report? . . . .

---

[1] Similarly, except for alleging that the opinion "lacks any supporting evidence in the record," Aerojet fails to substantively challenge Timko's opinion that the same OMAC valves would be used over the Starliner's lifetime. ECF No. 235 at 14.  Timko's rationale for that position can be gleaned from his expert report.  *See* Timko Rep. ¶¶ 9, 104, 109, 124.

> A: Yeah, I do, but I just told you what my methodology is.  It comes from my experience as a -- 43 years of experience, that's the method.  It has to do with what's inside my brain.  That's my method.  You know, I went into my memory and accessed a memory cell.  That was my method.

ECF No. 237 at 12.  Read alone, the Court agrees with Aerojet that this statement is problematic.  *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."); *GPNE Corp. v. Apple, Inc.*, No. 12-CV-2885, 2014 WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014) ("While the Court does not doubt that Mr. Dansky is an experienced professional, Mr. Dansky's '30 years of experience' does not constitute 'sufficient facts or data,' or 'reliable principles and methods.'").

In his expert report, Timko further develops the basis for his conclusions.  He takes a few different approaches when estimating an avoided delay.  Timko relies on his approximation for a single "development iteration" to estimate several of the delays that Aerojet avoided by relying on ValveTech's trade secrets.  *See, e.g.*, Timko Rep. ¶¶ 403, 409.  As he explains, "a development iteration of [a] design [involves] creating new drawings and the associated verification of the design, manufacturing and assembly of a revised[] design, and associated verification test of a revised design."  *Id.* ¶ 409.  Timko states that, in the industry and based on his professional experience, one "development iteration" for a valve design takes between four to six months.  *Id.* ¶ 403.  To estimate an avoided delay, Timko also relies on his experience "resolving similar issues," Timko Rep. ¶ 416, as well as the real-world delays incurred during the project, Timko Rep. ¶ 409 (concluding that, because Aerojet had knowledge of "the testing and development issues associated with ValveTech's Retainer Seal Design," it was able to avoid the two-to-three month delay that ValveTech suffered from the "investigation of the damage to the retainer ring of the Retainer Seal Design").

While the Court is able to follow Timko's chain of reasoning, it shares Aerojet's concern that many of these "avoided delay" estimates amount to objectively unverifiable conclusions grounded solely in Timko's experience.  *See* ECF No. 235 at 16.  Timko does not, for example, identify the similar projects or other objective data on which he relies to estimate that a full development iteration will take "four to six months."  Rather, Timko's deposition testimony suggests that such an estimate is less grounded on an objective methodology or comparison and more on Timko's own subjective "sense" of how long the steps in the design process could take.[2] Such expert testimony is inadmissible.  An "expert is not a black box into which data is fed at one end and from which an answer emerges at the other; the Court must be able to see the mechanisms in order to determine if they are reliable and helpful." *Lawrence v. Raymond Corp.*, No. 09-CV-1067, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011).  That is why "an expert relying solely on his experience must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Potter v. United States*, No. 17-CV-4141, 2020 WL 2836440, at *7 (S.D.N.Y. May 30, 2020).

---

[2]     Q: Understanding how much delay would be associated with a redesign effort.

A: Well, so it depends on, you know, what specifically needs to be redesigned.  But let's just -- you know, just for talking purposes assume that maybe it was, you know, outing an omni seal on the Aerojet seal package to stop the leakage.  So that would require, you know, I don't know, maybe five new drawings to be drawn up.  So you know, that's -- you know, a month maybe, get them checked, a month, and then, you know, they have a review there, everybody agreed that yes, these are good to go.  You know, that's going to push you out even more.  And then, you know, the whole kind of like hard thing to determine here is how long it will  take to make, you know, new parts.  That lead time could substantially depend on what part it is, but you know, if it's not too bad you might be able to get parts in, you know, a couple of months and then -- you know, easily another month or so.  So it could easily add up to, you know, four to six months if you had to do a redesign and require new parts to be made.

Timko Dep. at 279-80, *available at* ECF No. 258-12.

5

Having considered the parties' arguments, the Court is inclined to agree with Aerojet that some aspects of Timko's expert testimony on the avoided delays may be inadmissible. *See* Fed. R. Ev. 702(c), (d). Specifically, any estimates grounded in Timko's subjective view, rather than on an objective methodology or comparison, like real-world delays, may be inadmissible. The Court intends to exclude the former opinions at trial. *Accord Medidata Sols., Inc. v. Veeva Sys., Inc.*, No. 17-CV-589, 2021 WL 3773464, at *2 (S.D.N.Y. Aug. 25, 2021) (expert opinion suggesting that defendant "saved a specific amount of time due to its alleged misappropriation" deemed inadmissible, where expert failed to provide a "demonstrated or reliable method for determining the specific degree of head start provided by each alleged use of specific [plaintiff] trade secrets"). However, this preliminary ruling does not preclude ValveTech from seeking to admit such evidence should it be able to present the necessary foundation at trial.

### b. Identification of Trade Secrets

Aerojet argues, for a variety of reasons, that Timko's expert opinions that certain items and materials constitute trade secrets are inadmissible under Rule 702. *See* ECF No. 235 at 17-23. While Aerojet focuses on the purported defects in Timko's reasoning and conclusions, there is a more basic question that Aerojet's arguments implicate: whether Timko should be permitted to offer a *legal conclusion* as to whether the identified items and materials constitute trade secrets under applicable law.

It is true that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Ev. 704(a). Nevertheless, the Second Circuit "is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992). Expert testimony may be helpful "in guiding the trier of fact through a complicated morass of obscure terms and concepts," but when "an expert undertakes to tell the

jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). "When this occurs, the expert acts outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination." *Id.*

For these reasons, to the extent Timko is simply applying the relevant statutory criteria to determine whether ValveTech's materials constitute trade secrets under applicable law, his opinion is likely inadmissible. In the context of litigation over trade secrets, courts have distinguished between "an expert opining that an item is or is not a 'trade secret,'" which is inadmissible, and an expert providing "facts and analysis which lead the jury toward that conclusion," which is admissible. *See Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, No. 13-CV-82, 2019 WL 1435934, at *4 (W.D. Ky. Mar. 29, 2019) (collecting cases).

To succeed on a trade-secret misappropriation claim under the federal Defend Trade Secrets Act and California Uniform Trade Secrets Act, "a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff. *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020). "[T]he definition of what may be considered a 'trade secret' is broad." *Id.* at 657. "[T]he definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *Id.* With respect to the second element, the information must "derive[] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B); *see also* Cal. Civ. Code §

3426.1(d)(1).  With respect to the third element, the owner must take "reasonable measures to keep such information secret."  18 U.S.C. § 1839(3)(A).

The factors underlying the ultimate legal determinations of whether information is a trade secret and whether misappropriation has occurred are appropriate subjects of expert testimony. *See, e.g., Scentsational Techs., LLC v. Pepsi, Inc.*, No. 15-CV-8645, 2018 WL 1889763, at *7 (S.D.N.Y. Apr. 18, 2018) (packaging expert could testify as to how "unique and valuable [plaintiff's] technology is within the industry," but could not "offer the legal conclusion that the technology is a trade secret"); *Better Holdco, Inc. v. Beeline Loans, Inc.*, No. 20-CV-8686, 2023 WL 2711417, at *25 (S.D.N.Y. Mar. 30, 2023) (deeming admissible expert's testimony regarding whether plaintiff took reasonable measures to keep its data secret); *Neural Magic, Inc. v. Meta Platforms, Inc.*, No. 20-CV-10444, 2023 WL 2383172, at *21 (D. Mass. Mar. 6, 2023) (allowing expert to opine on reasonableness of plaintiff's protective measures, but not "whether those measures meet the statutory requirements" for trade-secret protection); *HighMark Digital, Inc. v. Casablanca Design Ctrs., Inc.*, No. 18-CV-6105, 2020 WL 2114940, at *7-9 (C.D. Cal. Mar. 26, 2020) (expert could not testify that plaintiff's source code and files constitute trade secrets, but was permitted to testify regarding the value of the code and files, the steps plaintiff took to keep the information secret, and that defendants likely reverse-engineered plaintiff's files); *Life Spine, Inc. v. Aegis Spine, Inc.*, No. 19-CV-7092, 2023 WL 2933044, at *7 (N.D. Ill. Apr. 13, 2023) (stating that an expert may properly opine as to "dimensional similarities (or differences)" between a plaintiff's device and an alleged "knock-off" device to help the jury determine whether misappropriation has occurred).

For these reasons, as a preliminary ruling, the Court intends to exclude Timko's trade-secret opinions to the extent he opines on, for example, the legal issues of whether particular

information constitutes a trade secret under applicable law, *see, e.g.*, Timko Rep. ¶¶ 336-45, and whether Aerojet misappropriated (or used without proper authorization) ValveTech's alleged trade secrets,[3] *id.* ¶ 368.  Aerojet's challenges to Timko's opinions on these matters are well-taken.

By contrast, the Court intends to admit Timko's trade-secret opinions to the extent he opines on technical matters concerning the relevant factors related to trade-secret misappropriation, including, for example, whether ValveTech's designs, data, and other information derived independent economic value from not being generally known,[4] *id.* ¶¶ 342, 345, 346-48, whether ValveTech took measures to protect its allegedly proprietary information consistent with industry standards,[5] *id.* ¶¶ 350-64, whether the design, manufacture, and assembly of Aerojet's valve are substantially similar to the design, manufacture, and assembly of ValveTech's, *id.* ¶¶ 291-314, 323, 366, 385, whether Aerojet's valve is similar in design to Aerojet's heritage valves, *id.* ¶ 309, and whether ValveTech's Teflon seat design is disclosed by its patent, *id.* ¶ 378.  Aerojet's criticisms of Timko's opinions on these matters do not merit a preliminary ruling and can be addressed via *voir dire* and/or cross-examination.

---

[3] In particular, Timko may not testify that Aerojet exceeded its authorization to use ValveTech's proprietary information based on an implied duty of secrecy grounded either in the parties' course of dealings or standard industry practice.  *See* Timko ¶ 393 (opining that Aerojet's conduct "exceeded what was authorized between the two parties" in light of his "industry experience and the parties' course of dealing"); *see also* ECF No. 201-2 at 23 (arguing that a "written NDA is not required to meet the secrecy element as long as reasonable and industry-appropriate efforts to maintain secrecy are made").  Where, as here, the parties have "contracted the limits of their confidential relationship regarding a particular subject matter," that contract "supplants any implied duty of confidentiality that may have existed between the parties."  *Convolve, Inc. v. Compaq Comp. Corp.*, 527 F. App'x 910, 924 (Fed. Cir. 2013) (summary order) (applying California law).

[4] Insofar as Aerojet asserts that Timko's expert report is too generalized with respect to the value of ValveTech's proprietary information, it is free to examine Timko on that issue in the context of *voir dire* and/or cross-examination. *See* ECF No. 235 at 22-23.  The Court declines to issue any preliminary ruling.

[5] However, while Timko may speak generally to the use of NDAs within the industry, he may not opine on whether the NDAs in this case covered ValveTech's alleged trade secrets.  *See* Section I(c), *infra*.

### c.  Contract Interpretation

Timko opines that, in several respects, Aerojet "exceeded its contractually permitted uses of the trade secret, proprietary information disclosed to Aerojet by ValveTech."  Timko Rep. ¶ 393; *see also id.* ¶¶ 6, 394, 395.  Aerojet moves to exclude this opinion.  *See* ECF No. 235 at 23-27.  As a preliminary ruling, the Court agrees with Aerojet and intends to preclude Timko from offering such opinions.

"In the context of contract claims, courts have held that an expert may not testify as to the parties' obligations under the contract or whether the contract was breached."  *Dominion Res. SVC, Inc. v. Alstom Power, Inc.*, No. 16-CV-544, 2018 WL 3752878, at *10 (D. Conn. Aug. 8, 2018) (collecting cases); *see also Med. Sales & Consulting Grp. v. Plus Orthopedics USA, Inc.*, No. 08-CV-1595, 2011 WL 290986, at *3 (S.D. Cal. Jan. 27, 2011).  Therefore, the Court intends to preclude Timko from testifying on (a) his interpretation of the terms of, or of the obligations arising under, the relevant contracts, including what types of information are covered by the NDAs and whether certain types of uses were authorized or unauthorized thereunder, *see, e.g.*, Timko Rep. ¶¶ 335, 394, 395, and (b) as applied, whether Aerojet used ValveTech's proprietary information in a manner inconsistent with, in excess of its authority under, or in breach of, its contractual obligations, *see, e.g.*, *id.* ¶¶ 394, 395.  Timko is, of course, free to reference the contracts in discussing his opinions, and he may testify about general industry practices regarding the protection of proprietary information and whether ValveTech's measures, including its contracts, were generally consistent with those practices.  *See id.* ¶ 393; *see also Plus Orthopedics*, 2011 WL 290986, at *3 ("[A]n expert can testify about the practices and norms of an industry if the expert is qualified as an expert by knowledge, skill, experience, training, or education." (internal quotation marks omitted)).  *But see* note 5, *supra*.  The relevant distinction is that Timko may offer

expert testimony within his realm of expertise to assist the jury in resolving the legal issues regarding breach of contract, but he may not himself offer an opinion on those ultimate legal issues. *Cf. Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (expert's testimony on industry standards was admissible, where his testimony that "[d]efendants deviated from industry standards *supported* a finding that they acted in bad faith, [but the expert] never testified that he had *reached a legal conclusion* that Defendants actually acted in bad faith (i.e., an ultimate issue of law)" (emphases added)); *Doe v. Colgate Univ.*, 760 F. App'x 22, 29 (2d Cir. 2019) (summary order) ("[The expert's] opinion that the University breached its contract with John Doe by failing to follow its own procedures is unhelpful because it usurps the jury's role in applying the law to the facts.").

### d.   False Statements

Aerojet moves to preclude Timko's opinions that it made "false statements to Boeing." ECF No. 235 at 27-28; Timko Rep. ¶¶ 15, 16.  As ValveTech notes, however, Timko's opinions are grounded in his technical analysis of ValveTech's capabilities.  *See* Timko ¶¶ 166-70.  The Court declines to preclude these opinions to the extent they are limited to whether these statements were "incorrect" as a technical matter.  ECF No. 256 at 24-26.  However, the Court intends to preclude Timko's opinions to the extent he opines on any person's subjective beliefs at the time the statements were made or opines about Aerojet's motives for making the statements.  *See, e.g.*, Timko Rep.  ¶ 166 ("These claims were clearly made to defend Aerojet Rocketdyne's decision to terminate the ValveTech OMAC contract and provide confidence to Boeing that Aerojet could provide a qualified valve to recover program schedule."); *see also Sparta Commercial Servs., Inc. v. DZ Bank*, 680 F. App'x 17, 19-20 (2d Cir. 2017) (summary order) ("A district court properly

rejects an expert's testimony when the testimony involves qualitative opinions about an area outside the expert's field of expertise[] or when the expert opines on witnesses' credibility.").

### e. Changes of Specifications

Aerojet moves to preclude Timko's opinions "describing and opining on changes made to the specification requirements" for the OMAC isolation valve. ECF No. 235 at 28. Aerojet asserts that these opinions are irrelevant, confusing, and misleading. *Id.* at 29. The Court is not persuaded. As ValveTech states, Aerojet's actions are relevant to their motives and intent near the time of contract termination. ECF No. 256 at 26-27. Timko may testify as to the nature of the specification changes, the reduced burdens they entailed, and industry norms regarding such changes; he may not offer any opinions on Aerojet's subjective beliefs at the time of the changes or Aerojet's motives with respect to those changes. *See, e.g.*, Timko Rep. ¶ 162 (stating that specification changes were part of a "ploy"); *id.* ¶ 429 (suggesting that Aerojet "took advantage of ValveTech").

### f. Opinions on Witness Credibility

Aerojet moves to exclude Timko's opinion regarding Martin Bleck's explanation for the design of Aerojet's OMAC valve. ECF No. 235 at 29. Timko found Bleck's explanation "weak" for several reasons, Timko Rep. ¶ 309, and Aerojet argues that Timko's opinion encroaches on the jury's task to decide a witness's credibility. In part, the Court agrees. Timko may properly testify to issues within the realm of his technical experience, including, for example, that Bleck's design is substantially similar to, incorporates features of, ValveTech's designs, data, and other proprietary information, *see id.* ¶¶ 309, 312, 313, that Bleck's design is dissimilar to his supposed reference designs, *id.* ¶ 309, that Bleck's development timeline is "unprecedented in the aerospace industry," *id.* ¶ 308, that Bleck did not have relevant design experience, *id.* ¶¶ 245, 307, that Aerojet deviated from industry standards by moving ValveTech's project in-house, *id.* ¶ 164, and

that Aerojet's design process—especially its lack of a "firewall"—was inconsistent with industry standards. *Id.* ¶ 316. Timko may not opine as to whether he finds particular witnesses credible or, as to the primary issue, whether he believes Bleck and Aerojet relied on ValveTech's designs and data. *See, e.g.*, *id.* ¶¶ 315-16. It is evident that Timko does not rely solely on his technical expertise to reach the latter conclusion, but also engaged in more run-of-the-mill credibility determinations. *See, e.g.*, *id.* ¶ 319 (finding it "unreasonable" to assume that Aerojet would not use ValveTech's proprietary information given the "time pressure"); Timko Rep. ¶¶ 284-85, 325 (analyzing the inconsistent explanations of Bleck and Little).

## II.   Aerojet's Motion *in Limine* No. 2 – Justin Blok

### a.   Avoided Delays

Blok's damages opinion with respect to avoided delays is premised on Timko's opinion on that issue. *See* Blok Rep. ¶¶ 86-91. Because the Court intends to exclude Timko's opinion in part, *see* Section I(a), *supra*, the Court agrees with Aerojet that Blok's opinion must likewise be excluded to the same extent. *See* ECF No. 236 at 12 n.1. However, to the extent Timko has admissible opinions on avoided delays, the Court intends to admit Blok's opinion, and Aerojet's criticisms of his methodology and assumptions "go to the weight, not the admissibility, of the testimony." *Robinson v. Suffolk Cty. Police Dep't*, 544 F. App'x 29, 32 (2d Cir. 2013) (summary order).

### b.   Prospective Profits

Raising several grounds, Aerojet challenges Blok's prospective-profit theory of damages, which is based on Timko's opinion that the Starliner would operate for sixty years at a rate of 4.5 missions per year. *See* ECF No. 236 at 14-16; Blok Rep. ¶¶ 67, 69, 70. The Court does not intend to exclude Blok's prospective-profit theory of damages. Aerojet's challenges to the assumptions

underlying Blok's estimates "go to the weight, not the admissibility, of the testimony." *Robinson*, 544 F. App'x at 32.

### c. Main & Pilot Valves

Aerojet asserts that Blok relied on an incorrect assumption—that ValveTech would supply both main and pilot valves to Aerojet—in calculating damages. *See* ECF No. 236 at 16-17. Aerojet's dispute goes to the weight of Blok's testimony and does not warrant outright exclusion. *See Robinson*, 544 F. App'x at 32.

### d. Cost of Manufacturing Opinion

Aerojet argues that Blok relied on incorrect assumptions to calculate Aerojet's cost to manufacture its OMAC valve. ECF No. 236 at 17-19. This issue goes to the weight of the opinion and is not grounds for exclusion.

In addition, the Court rejects Aerojet's argument that damages for unjust enrichment cannot encompass future benefits obtained. *See id.* ValveTech is not seeking damages for some hypothetical future benefit that Aerojet may (or may not) obtain, but is instead seeking damages based on the *present value* of the benefit Aerojet has already obtained—namely, the capability it obtained to manufacture and qualify its own OMAC valves by relying on ValveTech's alleged trade secrets. *See* ECF No. 192-39 ¶¶ 96-98, 102.

### e. Breach of Contract Damages

Aerojet criticizes several of the factual assumptions underlying Blok's estimates for breach-of-contract damages. *See* ECF No. 236 at 19-22. Aerojet's concerns go to the weight of the opinion and are not grounds for exclusion.

### f.   Blok's Reliance on Hearsay Evidence

Aerojet challenges Blok's reliance on alleged hearsay evidence.  *See id.* at 22-24.  The Court defers ruling on this issue until trial.

### g.   Blok's Statements About Legal Standards

Aerojet argues that Blok may not testify regarding the relevant legal standards.  ECF No. 236 at 24.  ValveTech states that Blok will not opine about the law.  ECF No. 257 at 24.  The Court agrees with the parties.

## III.   Aerojet's Motion *in Limine* No. 3 – Confidentiality Markers

Aerojet requests that the trial exhibits be submitted in their "native" formats so that they do not include any "confidentiality" tags added by the parties during discovery.  ECF No. 219-1 at 2.  ValveTech opposes this request, arguing that the process of removing those designations would be burdensome and risk public disclosure.  *See generally* ECF No. 250.

The Court agrees with Aerojet.  ValveTech offers no scenario in which these tags would be relevant.  To the contrary, they are not only irrelevant, given that they were not added until after underlying events, but highly prejudicial, as they would imply to the jury that the documents are, in fact, confidential—one of the central issues in dispute.  ValveTech's suggestion that a jury instruction would cure any prejudice is unpersuasive.  Because one of the key requirements for information to be covered by the parties' NDAs is that they be marked as such, *see* ECF No. 106-4 at 2; ECF No. 106-5 at 3, the Court would need to instruct the jury to, on the one hand, ignore certain designations, and, on the other hand, affirmatively consider others.  There exists a strong likelihood of jury confusion.

Accordingly, the parties shall remove from any trial exhibits the confidentiality tags added as part of discovery.  The parties are <u>not</u> required to provide courtesy copies of the updated exhibits

to the Court, as the Court assumes that the exhibits will be identical except for removal of the confidentiality tags.

To address ValveTech's concerns regarding the ongoing applicability of the protective order, all trial exhibits whose confidentiality tags are removed shall nevertheless be covered by the protective order. The parties shall work together to catalogue the trial exhibits to be covered by the protective order notwithstanding the lack of a confidentiality tag. The parties shall submit that list to the Court, along with proposed stipulated amendments to the protective order governing nondisclosure and protection of those unmarked exhibits. To the extent third parties' rights may be affected, the parties shall meet and confer with the third parties to ensure that their concerns are addressed in the proposed amendments.

## IV.   Aerojet's Motion *in Limine* No. 4 – Breaches of P.O. 200 & P.O. 441

Aerojet moves to exclude all evidence "relating to the alleged breaches of the 200 P.O. and 441 P.O." ECF No. 220-1 at 5. Although the parties agree that evidence about these purchase orders is relevant as a general matter, Aerojet's concern is any "potential testimony or argument raising [its] purported breach of the purchase orders." ECF No. 270 at 5.

ValveTech responds that evidence of purchase-order breaches is relevant for the purpose of showing that Aerojet misappropriated ValveTech's trade secrets by violating its contractual duty to maintain the secrecy of the information. *See* ECF No. 251 at 2. As to that purpose, the Court agrees with Aerojet that the evidence would be inadmissible. At summary judgment, the Court precluded ValveTech from pursuing breach-of-contract claims based on agreements that had not been pleaded in the complaint. *See ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*, No. 17-CV-6758, 2022 WL 4562352, at *3-4 (W.D.N.Y. Sept. 29, 2022). For the same reasons, the Court will not permit ValveTech to pursue misappropriation claims grounded on contracts that were not

pleaded in the complaint.   In the operative complaint, ValveTech alleges that Aerojet's duty of secrecy is based on the 2011 and 2017 NDAs; it does not reference other contracts.  *See* ECF No. 106 ¶¶ 69-83, 90, 98, 100, 115, 123, 125.   ValveTech may not pursue a new misappropriation theory at this late stage. *Cf. Storagecraft Tech. Corp. v. Persistent Telecom Sols, Inc.*, No. 14-CV-76, 2015 WL 9592517, at *8 (D. Utah Dec. 31, 2015) (on summary judgment, rejecting defendant's attempt to "salvage" its misappropriation counterclaim by arguing that another agreement required plaintiff to keep information confidential, since that theory was not alleged in the complaint).

ValveTech also contends that evidence about the purchase orders "and the parties' performance thereunder" is "highly relevant."   ECF No. 251 at 2.   Aerojet agrees with that proposition and seeks only to exclude evidence concerning "Aerojet Rocketdyne's purported breach of the purchase orders."   ECF No. 270 at 5.   Thus, ValveTech is not precluded from marshalling evidence relating to performance under the purchase orders that is not connected to Aerojet's alleged breaches, including the "price, quantity, schedule, technical requirements, and other relevant project information," as well as the falsity of Aerojet's claim "to Boeing that ValveTech could not solve certain technical issues on the PO's required schedule."   ECF No. 251 at 8-9.

Finally, ValveTech suggests that Aerojet's purchase-order breaches may be relevant, even if not as the substantive bases for their misappropriation claims, to prove Aerojet's motives and bad faith.  *See* ECF No. 251 at 9.   The Court defers ruling on whether the purchase-order breaches may be admitted for such purposes.   On the one hand, evidence that Aerojet breached not only the NDAs but also the purchase orders may be relevant to prove ValveTech's theory that Aerojet's conduct was not the result of a good-faith business disagreement or a mere "deal gone bad," but

was a predatory scheme to misappropriate ValveTech's trade secrets for its own economic gain. Thus, contrary to Aerojet's argument, its entire course of dealings with ValveTech regarding the OMAC isolation valve may be relevant, notwithstanding that the misappropriation claims are themselves only premised on the duties of secrecy arising from the NDAs. *See* ECF No. 270 at 6-7. On the other hand, there may be a risk of prejudice and jury confusion if the parties are permitted to indiscriminately assert duties, rights, and breaches under unpled agreements without a sufficient legal basis.[6] And special care would need to be taken to ensure that the jury understands that, regardless of the purchase-order breaches, ValveTech's misappropriation claims are premised only on the 2011 and 2017 NDAs. For these reasons, the Court defers ruling on the admissibility of such evidence for the purpose of proving Aerojet's motives, intent, or bad faith.

## V. Aerojet's Motion *in Limine* No. 5 – Evidence of Aerojet's Wealth, Size, Etc.

Aerojet moves to exclude evidence of its "wealth, size, financial condition, market share, revenue, profits, or other evidence of its wealth or power relative to [] ValveTech." ECF No. 221-1 at 2. The Court defers ruling on this issue. ValveTech avers that it will not "introduce Aerojet's overall market cap or assets," ECF No. 252 at 6, and, as ValveTech argues, there may be several permissible reasons to admit evidence of Aerojet's wealth, market share, and position relative to ValveTech, including its motives and intent with respect to misappropriation. *See generally* ECF No. 252. The precise line between admissible and inadmissible evidence on this issue is better addressed at trial.

---

[6] For example, ValveTech may wish to present evidence and argument that Aerojet breached the 441 P.O.'s condition that "ValveTech proprietary data cannot be distributed without the written consent of ValveTech." ECF No. 106-1 at 5. As a matter of contract interpretation, several questions arise. What constitutes proprietary data? Is that term defined by reference to the 2011 NDA, or is it distinct term which, if ambiguous, requires extrinsic evidence to interpret? Is that condition limited in duration? Does "proprietary data" only encompass data that is disclosed "in connection with [the 441 P.O.] or other agreement referencing [the 441 P.O.]" *id.*, or is it a free-floating nondisclosure clause?

## VI.     Aerojet's Motion *in Limine* No. 6 – Changes to Specification

Aerojet moves to exclude evidence "related to changes made to the valve specifications." ECF No. 222-1 at 2.  The Court is inclined to admit such evidence.  As ValveTech explains—and contrary to Aerojet's belief that its "allegedly unfair manner of doing business" is irrelevant, ECF No. 272 at 3—these changes are relevant to Aerojet's motives and intent with respect to misappropriation.  *See generally* ECF No. 265.  ValveTech's fact witnesses will be permitted to explain, based on their personal knowledge, how the specifications changed over time, *id.* at 9-10, and Aerojet offers no reason why Timko cannot also discuss the specification changes, which he describes in detail in his expert report.  *See, e.g.*, Timko Rep. ¶¶ 12, 173.

## VII.    ValveTech's Motion *in Limine* No. 1 – David Crisalli & Aerojet's Cross-Motion

ValveTech moves to exclude one of Aerojet's experts, David Crisalli, from testifying at trial.  ECF No. 246 at 1-2.  The Court defers ruling on this matter until trial.  Aerojet intends to offer Crisalli's testimony to rebut several of Timko's opinions, including those relating to contract interpretation.  *See, e.g.*, ECF No. 248 ¶¶ 34, 36, 53, 69, 76.  Because the Court has substantially curtailed the scope of Timko's testimony, Crisalli's testimony likewise must be curtailed.  As a result, many of ValveTech's objections are moot.  To the extent that ValveTech continues to object to any of Crisalli's remaining opinions—for example, his position on the expected life of the Starliner or industry standards regarding bringing work "in-house," ECF No. 248 ¶¶ 86-90, 118-23—it may raise them at trial.

Aerojet's cross-motion to exclude references to "Crisalli's access under the protective order" is denied without prejudice to raising at trial, should that matter become an issue.  ECF No. 239 at 16.

**VIII.    ValveTech's Motion *in Limine* No. 2 – Sequestration**

ValveTech and Aerojet agree that fact witnesses should be excluded "from hearing any other witnesses' (including expert witnesses') testimony at trial."  ECF No. 224-1 at 1; *see also* ECF No. 244; Fed. R. Ev. 615.  The Court agrees.

**IX.    ValveTech's Motion *in Limine* No. 3 – Prior Court Orders**

The parties agree that procedural facts relating to prior motion practice, and the Court's disposition thereon, should be excluded.  *See* ECF Nos. 225-1, 243, 274.  The Court agrees.  This ruling does not address the admissibility of any evidence, admissions, or declarations presented in the course of such motion practice.  *See* ECF No. 243 at 2; ECF No. 274 at 1-2.

**X.    ValveTech's Motion *in Limine* No. 4 – Hearsay & Aerojet's Cross-Motion**

ValveTech moves to preclude Aerojet from introducing into evidence or using certain unauthenticated hearsay documents on which defense expert Alan Minick relied in his expert report.  *See* ECF No. 226-1.  Generally, Minick relied on these exhibits to opine that certain design features which ValveTech claims as trade secrets were, in fact, publicly known.  *See* ECF No. 248-3 ¶¶ 80-82, 145, 166-70.  Aerojet opposes the motion and cross-moves that the documents be deemed "sufficiently authenticated."  ECF No. 240 at 8 n.7.

Ruling on these issues is deferred until trial.  Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Ev. 703.  "[T]he purpose of the rule is to align the law with the extrajudicial 'practice of experts' who may base their opinions on technically inadmissible evidence, such as

unauthenticated x-rays and oral reports by nurses." *United States v. Scop*, 846 F.2d 135, 143 (2d Cir. 1988).

Minick's opinion would appear to fit squarely within the bounds of Rule 703.  To determine whether certain design features were publicly known at the time of the relevant events, Minick consulted a variety of pre-existing documentation.  *See, e.g.*, ECF No. 248-3 ¶¶ 179-81 (opining that use of dynamic seals or bushing was publicly known based on a 1976 NASA document, 1970 Air Force document, and a 1971 book by NASA).  He concludes that the concepts underlying ValveTech's purported trade secrets "were well known" to the public.  *See, e.g.*, *id.* ¶ 17.  So long as experts in Minick's field would "reasonably rely" on the sorts of studies and documentation on which he relies, Minick's opinion may be admitted.  *See* Fed. R. Ev. 703.  At least at this juncture, the Court cannot conclude that Minick's opinion will be inadmissible for his reliance on such information.

To be sure, ValveTech's primary concern is the admission of the documents themselves, rather than Minick's opinion pertaining to such documents.  *See* ECF No. 226-1 at 1.  The "underlying information" on which an expert relies "is not admissible simply because the opinion . . . is admitted."  Fed. R. Ev. 703, 2000 committee notes.  "The information may be disclosed to the jury, upon objection, only if the trial court finds that the probative value of the information in assisting the jury to evaluate the expert's opinion substantially outweighs its prejudicial effect."  *Id.*  The Court declines to undertake this evaluation, or to decide whether the documents are independently admissible, before trial.

## XI.   ValveTech's Motion *in Limine* No. 5 – Courtroom Closure

ValveTech requests that the Court "close the courtroom when the technical details ValveTech's trade secrets or NASA's manned spacecraft are discussed."  ECF No. 227-1 at 6.

Aerojet does not oppose ValveTech's request so long as "any discussion of sealing [is] made outside of the presence of the jury" and the jury "remain[s] unaware that the courtroom has been sealed." ECF No. 241 at 3. The parties intend to meet and confer to determine an appropriate procedure for closure. ECF No. 276 at 1.

The Court denies ValveTech's request without prejudice. "The First Amendment affords the public a qualified right of access to a wide array of judicial proceedings in both criminal and civil matters." *In re Demetriades*, 58 F.4th 37, 47 (2d Cir. 2023). "[T]he power to close a courtroom where proceedings are being conducted is one to be very seldom exercised, and even then only with the greatest caution, under urgent circumstances, and for very clear and apparent reasons." *Id.* (internal ellipsis omitted). "The First Amendment right of access is always qualified," however. *N.Y.C. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 303 (2d Cir. 2012). "Just as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial." *Id.* The justification for denying access "must be a weighty one," and "[c]losed proceedings, although not absolutely precluded, must be rare and only for cause shown." *Id.*

As a general matter, the Second Circuit has opined that "exclusion of the public in whole or in part has been found constitutionally acceptable where closed proceedings were deemed necessary to preserve order, to protect the defendant or witnesses, or *to maintain the confidentiality of certain information*." *United States ex rel. Lloyd v. Vincent*, 520 F.2d 1272, 1274 (2d Cir. 1975) (emphasis added); *see also Stamicarbon, N.V. v. Am. Cyanamid Co.*, 506 F.2d 532, 539 (2d Cir. 1974) (permitting trial judge to restrict access to criminal contempt proceedings when testimony would reveal trade secrets). Consistent with this rule, courts have been willing to close court

proceedings if public access would "harm a litigant's competitive standing," *Woven Elecs. Corp. v. Advance Grp., Inc.*, 930 F.2d 913 (1991) (4th Cir. 1991) (table op.), so long as there is a "sufficient threat of irreparable harm." *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir. 1984).

While the Court acknowledges ValveTech's legitimate concerns, it is unprepared to conclude that *any* "presentation of the trade secrets and spacecraft designs at issue in this case" will *necessarily* cause a risk of irreparable, improper dissemination sufficient to warrant closure of the courtroom.  ECF No. 227-1 at 1.  The likelihood of that risk will depend on several factors, including the nature of the information discussed, the level of specificity at which the information is discussed, the persons in attendance, etc.  That analysis is better undertaken at trial. Nevertheless, the parties should meet and confer about a mutually agreeable procedure for closure, should it be required.

## XII.   ValveTech's Motion *in Limine* No. 6 - Public Disclosure

In connection with its amended complaint, ValveTech filed a copy of a 2013 Response to Request for Proposal.  ECF No. 106-3.  ValveTech asserts that, while this filing contains some trade-secret information, this public disclosure does not bear on Aerojet's liability or the potential damages. ECF No. 247 at 2, 10.  It requests that the Court prohibit Aerojet from arguing otherwise. Aerojet does not dispute that this subsequent public disclosure is irrelevant to its liability for misappropriation.[7]  *See* ECF No. 242 at 2.  But it responds that the public disclosure may bear on the question of damages.  *See id.* at 5-6 (citing relevant legal authority).

---

[7] Nor could it, given the Court's prior order, in which it held that ValveTech's public disclosure of the document in April 2020 is "irrelevant to misappropriation in 2016-17."  *ValveTech*, 2022 WL 4562352, at *12.  However, contrary to ValveTech's argument, the Court did not rule that ValveTech's public disclosure is irrelevant to the issue of damages.  *See* ECF No. 277 at 4.

The Court intends to exclude argument regarding public disclosure of the 2013 Response. The Court agrees with Aerojet that public disclosure of trade-secret information may, as a general matter, bear on damages for misappropriation. *See, e.g.*, *Fed. Exp. Corp. v. Accu-Sort Sys., Inc.*, No. 01-CV-2503, 2005 WL 8156707, at *17-18 (W.D. Tex. Mar. 30, 2005). But, in this case, ValveTech's damages primarily arise from (a) the loss of qualification for its OMAC valve in the Starliner program and, conversely, (b) Aerojet's wrongful qualification of its own OMAC valve. These occurred prior to ValveTech's public disclosure of the 2013 Response, and the harm resulting therefrom was "locked in" once they occurred. ECF No. 277 at 4. That is, once qualification occurred, the secrecy of ValveTech's OMAC-valve trade secrets became irrelevant: if ValveTech's valve were qualified, it would have been used for the duration of the program relationship regardless of its secrecy, and if it were not qualified, ValveTech could not "break into" that market even if it continued to closely guard its valuable information. *Cf.* Blok Rep. ¶ 71 (stating that, once a component part is qualified, "it is a near certainty that the [] part will be used for the life of the program"). Monetary relief to remedy the harm flowing from the permanent loss of a single, long-term business relationship may be appropriate, even if the trade secret later becomes public knowledge. *Cf. Accu-Sort*, 2005 WL 8156707, at *18 ("Monetary relief based on the defendant's use of the information after the loss of secrecy is therefore appropriate only to the extent necessary to remedy a head start or *other unfair advantage attributable to the defendant's prior access to the information*.") (quoting *Restatement (3d) of Unfair Competition* § 45 cmt. h (1995)) (emphasis added).

For these reasons, the Court intends to exclude evidence of ValveTech's public disclosure of the 2013 Response. However, this preliminary ruling does not preclude Aerojet from seeking

to admit such evidence should it present a persuasive argument the evidence or argument submitted at trial makes it relevant.

## CONCLUSION

For the reasons discussed above, the parties' motions *in limine* are resolved as stated herein.

IT IS SO ORDERED.

Dated: May 19, 2023
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York